IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RHIANNON P.,[1]

       Plaintiff,

   v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

       Defendant.
_____

Civ. No. 6:21-cv-1039-MC

OPINION AND ORDER

MCSHANE, Judge:

    Plaintiff brings this action for judicial review of the Commissioner's decision denying her application for disability insurance benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). On July 28, 2017, Plaintiff filed an application for benefits, alleging a disability onset date as of October 2, 2015. Tr. 36.[2] After the administrative law judge ("ALJ") determined Plaintiff was not disabled under the Social Security Act, Plaintiff requested review by the Appeals Council, which declined to review the ALJ's decision. Tr. 1–4. Plaintiff now appeals to the district court.

    Plaintiff argues that the ALJ erred by (1) failing to provide clear and convincing reasons to disregard Plaintiff's symptom testimony; and (2) improperly rejecting the opinions of

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case.

[2] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

1 – OPINION AND ORDER

Plaintiff's treating physician and Plaintiff's physical therapist. Pl.'s Br. 3, 12, ECF No. 12. For the reasons below, the Commissioner's decision is REVERSED and REMANDED for immediate payment of benefits.

## BACKGROUND

In 2014, Plaintiff was diagnosed with Ehlers-Danlos Syndrome ("EDS"), a genetic disease that causes hypermobility of the joints resulting in frequent dislocations and chronic pain. Tr. 1131. For much of her life, Plaintiff has experienced a constant aching pain in her joints that "ebbs and flows," and she frequently dislocates her ankles, knees, hips, and shoulders, often relocating them herself. Pl.'s Br. 4–5; Tr. 66. Plaintiff also suffers from fibromyalgia and obesity, which cause her to experience chronic muscle pain, fatigue, and gastrointestinal issues. Pl.'s Br. 4; Tr. 314.

Prior to her diagnosis, Plaintiff worked as an administrative assistant at Oregon Health & Science University ("OHSU"), but her symptoms caused her to increasingly miss work. Tr. 61. In October of 2015, Plaintiff could no longer maintain a full-time schedule and she quit her job. Tr. 38, 482. At that time, Plaintiff's treating physician, Nathalie Jacqmotte, M.D., also agreed with Plaintiff that she could not sustain gainful employment and that "long-term disability [was] appropriate." Tr. 483. At the request of her doctors, Plaintiff began physical therapy in 2015 to help strengthen her joints and prevent dislocation. Pl.'s Br. 5. When Plaintiff began therapy, she reported a pain level of 8/10, and frequent falls and dislocations in her right knee. Tr. 405. While she has dutifully kept up her physical therapy exercise program through 2019,[3] Plaintiff has seen "minimal improvement in symptoms." Tr. 1057. In a January 29, 2019, physical therapy session,

---

[3] The latest medical records available to the Court are from early 2019.

2 – OPINION AND ORDER

Plaintiff only showed a 15% improvement in the ability to lift a 10-pound object without symptoms and a 10% improvement towards the objective of increasing ankle and knee stability. Pl.'s Br. 8–9; Tr. 569.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial [evidence] means more than a mere scintilla but only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woods v. Kijakazi*, 32 F.4th 785, 788 (9th Cir. 2022) (internal quotations omitted). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920. The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant can make an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education,

and work experience. *Id*. If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant can perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful employment since the onset date of her alleged disability, through the date of her last insured. Tr. 38. At step two, the ALJ found that "[Plaintiff] ha[s] the following "severe" impairments: Ehlers-Danlos Syndrome (EDS), type 3; Fibromyalgia Syndrome (FMS); and Obesity (20 CFR 404.1520(c))." *Id.* The ALJ also noted that Plaintiff has a history of irritable bowel syndrome, migraine headaches, post-traumatic stress disorder ("PTSD") stemming from childhood abuse, anxiety, and depression, but listed these conditions as non-severe. Tr. 39. At step three, the ALJ found that Plaintiff's impairments do not meet the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 39–40. At this step, the ALJ also formulated the Plaintiff's Residual Functional Capacity (RFC). A claimant's RFC is the most they can do despite their limitations. 20 C.F.R. § 404.1545(a). Here, the ALJ found that Plaintiff can perform "light work as defined in 20 CFR 404.1567(b)," with the following modifications:

> except she can frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds; and can frequently push and pull as much as she can lift and carry bilaterally; and can occasionally reach overhead bilaterally, and can frequently reach in all other directions bilaterally; and can frequently handle and finger bilaterally; and must avoid even moderate exposure to vibrations and work hazards, such as moving machinery and unprotected heights.

Tr. 40. Finally, at step four, the ALJ found that Plaintiff could perform her past relevant work as an administrative assistant, DOT 169.167-010, which requires "sedentary exertion." Tr. 45.

I.       **Weighing of Plaintiff's Symptom Testimony**

Plaintiff argues that the ALJ improperly discredited her testimony regarding the "nature and intensity" of her limitations. Pl.'s Br. 23. "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). First, the ALJ determines, "whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal citations and quotations omitted). If the first step is satisfied, and the ALJ finds no evidence of malingering, the ALJ next determines the intensity and persistence of symptoms by considering "all of the available evidence from . . . medical sources and nonmedical sources." 20 C.F.R. § 404.1529(c)(1). "The ALJ can reject the claimant's testimony about the severity of her symptoms *only* by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1015 (emphasis added).

At a hearing on April 18, 2019, Plaintiff testified that her EDS and fibromyalgia symptoms make it impossible to maintain a consistent and reliable work schedule. Tr. 61. She stated that at least six-to-ten days a month she cannot leave the house because of her pain and fatigue. Tr. 61. Plaintiff stated she cannot "predict what days are going to be bad days," but when the flare-ups occur, she must lay down and avoid physical movement. Tr. 61–62. Plaintiff also stated that she lives with her boyfriend, and he primarily takes care of the household chores and cooks for her. Tr. 62. On her "good days" Plaintiff can contribute to the household chores for 15 minutes at a time. *Id.*

Despite Plaintiff's physical disabilities, she has attempted to maintain some level of productivity by enrolling part-time at Portland Community College ("PCC") to pursue a degree in technical writing. Tr. 63. At the hearing, Plaintiff testified that she was currently enrolled in three mostly online classes; 18th century literature, postcolonial literature, and "web tools for technical writers." Tr. 63–62. Plaintiff only has one in person class, and she receives significant accommodations with the school that allow for flexible deadlines and for her to miss classes when needed. Tr. 61–62. Plaintiff explained that with only three classes and her accommodations, the workload is manageable. Tr. 64. Most of her work is completed on her laptop, which can be done while she's laying down, and she completes her assignments sporadically during periods that her symptoms are less severe. *Id*. When asked about her goals for pursuing the degree, Plaintiff stated "[i]deally, I'd love to be able to do some sort of work from home online remotely. And there seems to be some options for that with technical writing. Honestly, I don't know yet. I don't know how it's going to go." Tr. 82.

The ALJ found that Plaintiff's testimony regarding "the extent and nature of her symptoms [was] not wholly reliable," citing inconsistencies between Plaintiff's alleged limitations and her "actual activities." Tr. 41. These activities include schoolwork, playing the violin, and learning Japanese. Tr. 41–42. The ALJ seemed notably offended by Plaintiff's excellent academic performance, particularly her 3.96 grade point average. Tr. 41–42. In his ruling, the ALJ cites Plaintiff's academic success as a reason to discredit the legitimacy of her symptom testimony no less than seven times, apparently finding it unfathomable that a person

with Plaintiff's physical symptoms could also be hardworking and intelligent.[4] *Id.* Plaintiff has faced tremendous physical and psychological adversity throughout her life; she should be commended for her academic success instead of arbitrarily penalized. Moreover, the flexible accommodations provided by Plaintiff's school provide her with an avenue to achieve this success. Similar accommodations – frequent breaks, unlimited absences, and extended deadlines – would not be possible in a full-time work environment.

Second, the ALJ takes issue with Plaintiff's artistic and linguistic endeavors. The ALJ notes that Plaintiff was taking Japanese classes "and found the writing practice to cause pain in her hands." Tr. 42.  Indeed, Plaintiff reported to her occupational therapist that her hand "locks after writing [for] 10-15 minutes," which made her Japanese lessons extremely difficult to get through. Tr. 351.  The record indicates that Plaintiff no longer takes these classes. Moreover, the ALJ seems to suggest that Plaintiff was taking Japanese lessons on top of her schoolwork, but this conflates Plaintiff's level of activity Tr. 42. Plaintiff's academic records show that she was enrolled in Japanese courses at PCC from the Fall 2016 term through Winter 2018 term, as part

---

[4] The ALJ further faults Plaintiff for expressing "concer[n] over being overly proud of herself for doing well in school, when in fact it was too easy." Tr. 41–42. It is unclear exactly how, as the ALJ asserts, this statement is "[in]consistent with the degree of unreliability [in the workplace] that [Plaintiff] asserts," but in any event, the ALJ portrays Plaintiff's statements completely out of context. *Id.* The statement comes from a July 18, 2018, therapy session where Dr. Brad Larsen-Sanchez, PhD, describes Plaintiff's internal conflict between her success and low self-image:

> The patient reported feeling overwhelmed by an increased awareness of how critical she can be of herself and use [sic] the word "oppressive" to describe the way she rates herself. The patient reported feeling like she is "wasting time," and though she is *doing exceedingly well in school she can convince herself that she is an idiot for being proud of herself for doing so well in school because it is too easy*.

Tr. 1075.

7 – OPINION AND ORDER

of her school curriculum. Tr. 289–286. It appears that these classes have counted as credits earned towards her degree and that she received the same accommodations for the on-campus Japanese class as she received for her other classes.

The ALJ also cites a chart note from January 24, 2017, where Plaintiff mentions her desire to resume playing violin and in November of 2017, where Plaintiff reported that she began playing with a community orchestra. Tr. 42. But Plaintiff also reported that her "chronic pain made it difficult to remain engaged throughout the rehearsals." Tr. 1005. While acknowledging that Plaintiff can only play violin for 20 to 30 minutes before she can no longer endure the pain it causes in her "right knuckle" and "whole body," the ALJ argues that "to even attempt such an activity, in which others depended on her commitment, suggests that [Plaintiff] viewed herself as predictable." Tr. 42. The ALJ faults Plaintiff for *even attempting* to engage in recreational activities while overlooking the fact that Plaintiff's disability prevents her from full and meaningful participation.

To "conclude that a claimant's daily activities warrant an adverse credibility determination," the ALJ must make specific findings that (1) the activities contradict the Plaintiff's testimony and (2) that the activities "meet the threshold for transferable work skills." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Neither condition is met here. The objective evidence supports Plaintiff's testimony that her EDS and fibromyalgia symptoms cause her significant pain, make it difficult for her to complete prolonged activities, and prevent her from maintaining a reliable full-time schedule. There is nothing in the record to suggest that Plaintiff goes to school full time, can play the violin for hours at a time or that she participates in an intensive orchestral program that requires a full-time commitment. To the contrary, the record

suggests that Plaintiff struggles to get through even 20-30 minutes of violin playing at a time. Tr. 42, 351. This activity is not consistent with a 40-hour-a-week full-time job. Minimal activities do not contradict allegations of disability, nor do they meet the "threshold for transferable work skills." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Plaintiff should not be denied benefits for attempting to engage in the community and maintaining some level of productivity in her life. *See Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998) ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."). One "need not vegetate in a dark room in order to be eligible for benefits." *Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012) *superseded on other grounds*, (citing *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987)) (internal quotation marks omitted).

The ALJ also discredits Plaintiff's testimony because of her desire to "have a baby and a family." Tr. 42. According to the ALJ, "this goal entails a responsibility which, even with assistance, requires that she act by her child's needs" everyday, and therefore, "indicates that [Plaintiff] herself expects that she could be able to be reliable." Tr. 42. The ALJ's problematic line of reasoning, to put it charitably, assumes that Plaintiff will be the full-time caregiver of her child with no assistance from her partner or other family members. Moreover, the ALJ unfairly penalizes Plaintiff not for being an actual mother, but for daring to hope to become a mother. The record shows that Plaintiff engaged in responsible family planning discussions with her doctors to see if a healthy pregnancy was even a viable possibility, given her EHS condition and symptoms of severe pain. Tr. 475, 503, 553. The Court is perplexed as to how Plaintiff's pursuit of such information serves to discredit the nature and intensity of her very real physical limitations. At the heart of the ALJ's pessimism is a misguided belief that motherhood is

somehow a privilege for only the non-disabled among us. One wonders if a male, seeking disability and hoping to be a father, would receive the same treatment.

Finally, the ALJ finds Plaintiff's engagement in physical therapy at-home exercises inconsistent with her substantive symptom testimony. Tr. 43. The ALJ describes the range of Plaintiff's proscribed exercises in great detail,[5] and concludes that Plaintiff's instructions to perform such exercises, "together with her academic activity, indicates that despite her painful or fatiguing symptoms, the claimant's impairments would allow full-time work at light exertion." Tr. 44. Again, the ALJ's reasoning is not supported by substantial evidence. What the Plaintiff was tasked to do in her exercise instructions and what she was actually capable of doing are two different considerations. The record indicates that Plaintiff regularly struggled to get through her at-home physical therapy tasks, and that after several years she still showed minimal improvement towards reaching her physical therapy goals.[6] Pl.'s Br. 8–9; Tr. 569. Moreover,

---

[5] The ALJ summarizes the instructed tasks as the following: "quadriceps isometrics, in which she would support her knee on a towel, and look at the muscle inside of knee; hamstring isometrics, in which she would dangle her knee over edge, bend against the edge, and feel the tendons behind the knee; gastroc and soleus stretches, requiring her to support the knee on a towel, use a rigid loop or strap and with the knee straight, pull up at the ball of the foot, to stretch upper calf and then bend the knee and pull it up at ball the of the foot, to stretch the lower calf; hamstring stretch, supporting the knee on a towel and bend it forward from the hips to stretch the lower thigh, knee, and upper calf; "tree toes" supported against wall, in which she would lift her arches; mini squats; and neck isometrics, in which she was to find a chin tuck position, bring her hand to her head, and push the hand into the head without letting the head move (Exhibit 13F, pages 178-179). Earlier, on March 24, 2014, her program involved a soleus stretch with good arch position, with likely strengthening of the transverse arch while strengthening the longitudinal arch. She would have toe curling exercises, the tree pose, sitting hamstring stretching, standing gastroc stretching, and prone hip internal rotation strengthening." Tr. 43–44.

[6] In January of 2019 Plaintiff only showed a 15% improvement in the ability to lift a 10-pound object without symptoms and a 10% improvement towards the objective of improving ankle and knee stability. Tr. 569.

10 – OPINION AND ORDER

these tasks, which consist mainly of stretches, are not consistent with a "light work" RFC, which entails "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and "requires a good deal of walking or standing." *See* 20 C.F.R. 404.1567(b); Pl.'s Br. 21. The record does not show that Plaintiff could maintain a consistent work schedule at this exertion level.

In sum, Plaintiff's rehabilitation attempts, activities of daily living, intellectual pursuits, and familial aspirations do nothing to contradict her inability to engage in consistent, full-time employment. Simply put, the pursuit of education and the arts, and a desire for motherhood is not inconsistent with a finding of disability. The ALJ has failed to offer clear and convincing reasons for discrediting Plaintiff's testimony. Generally, "the decision of the ALJ will not be reversed for errors that are harmless." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). But where a court finds that the disability determination outcome would have been different, if the ALJ properly credited the omitted opinion or testimony, then the error was not harmless. *Id*. at 1055. Here, a proper weighing of Plaintiff's symptom testimony would have supported a finding that Plaintiff is disabled.[7] The ALJ's errors were not harmless.

## II.     The ALJ's Weighing of Medical Opinions

The Ninth Circuit has clarified that under the new regulations, "the former hierarchy of medical opinions –in which we assign presumptive weight based on the extent of the doctor's relationship – no longer applies." *Woods*, 32 F.4th at 787. Now, an ALJ's "decision to discredit

---

[7] During the April 2019 hearing, vocational expert Richard Hinks testified that a person who misses two or more days of work per month "cannot sustain or maintain competitive full-time employment, even at the unskilled level." Tr. 77–78. Plaintiff testified that she cannot leave the house at least six-to-ten days a month due to her pain and fatigue. Tr. 61. A proper weighing of Plaintiff's testimony would support a finding of disability.

11  – OPINION AND ORDER

any medical opinion, must simply be supported by substantial evidence." *Id.* "The most important factors that the agency considers when evaluating the persuasiveness of medical opinions are *supportability* and *consistency*." *Id.* at 791 (emphasis added) (internal quotations omitted); 20 C.F.R. § 404.1520c(a). However, the Ninth Circuit clarified that "the extent of the claimant's relationship with the medical provider – what we will refer to as "relationship factors"– remains relevant under the new regulations." *Id.* at 790.

      Plaintiff contends that the ALJ's decision to dismiss the opinion of Dr. Jacqmotte, Plaintiff's long-time treating physician, was not supported by substantial evidence. Pl.'s Br. 15. The Court agrees in part. In a December 9, 2015 letter, Dr. Jacqmotte described EDS as a chronic disease of the joints with "no cure, just management," such as physical therapy. Tr. 1131. She wrote that Plaintiff suffers from chronic dislocation of the joints and that Plaintiff is "unable to do even sedentary work, given the level of fatigue and pain related to this chronic illness." *Id.* In an April 10, 2019 letter, Dr. Jacqmotte opined that Plaintiff's frequent dislocations impact her ability to work on a sustained basis and that her symptoms are "constant, daily, severe, and incapacitating." Tr. 1057. Dr. Jacqmotte also noted that Plaintiff has seen "minimal improvement" despite several years of physical therapy and that she believes Plaintiff is not malingering. *Id.*

      The Commissioner correctly notes that any statements by a medical source regarding whether the claimant is "disabled, blind, able to work, or able to perform regular or continuing work," is the type of evaluation reserved to the Commissioner, and therefore, the ALJ need not find those opinions valuable or persuasive. 20 C.F.R. § 404.1520b(c)(3)(i); *see* Def.'s Br. 10, ECF No. 13. Therefore, the ALJ committed no legal error by finding Dr. Jacqmotte's statement that Plaintiff was "not able to predictably work on a sustained basis" unpersuasive. Tr. 45.

12 – OPINION AND ORDER

Nevertheless, the ALJ's decision to discredit the rest of Dr. Jacqmotte's medically informed opinion was not supported by substantial evidence.

First the ALJ noted that Dr. Jacqmotte is not a specialist and "it is Plaintiff's treating specialists who are in the best position to ascertain her ability to work." Tr. 45. Curiously, the state-agency reviewing physicians[8] that offered opinions about Plaintiff's ability to work are also not "specialists," but the ALJ found those opinions more persuasive. Tr. 42–43. Plaintiff does not even have a specialist who the ALJ could compare Dr. Jacqmotte's opinion to. The fact that a more qualified person exists to proffer a medical opinion is not a persuasive reason to disregard Dr. Jacqmotte's opinion. *See* Pl.'s Br. 43.

The ALJ also argues that Dr. Jacqmotte's opinions regarding Plaintiff's reliability are "either speculative or based on [Plaintiff's] self-report." Tr. 45. An ALJ may reject a medical opinion that is "premised on [the Plaintiff's] own subjective complaints," where the ALJ had already properly discounted those complaints. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) *superseded on other grounds by* 20 C.F.R. § 404.1502(a). As established above, the ALJ did not properly discredit Plaintiff's symptom testimony. Nor is it apparent that Dr. Jacqmotte's opinion was entirely premised on Plaintiff's reports. Dr. Jacqmotte's opinion was sourced in her own medical knowledge as well as years of observation of Plaintiff's condition. That Dr. Jacqmotte's overall assessment may have incorporated Plaintiff's reported symptoms does not present a convincing reason to find Dr. Jacqmotte's opinion entirely unpersuasive.

---

[8] These include the opinions of Dr. John Ellison, Dr. Susan Moner, and Dr. Lloyd H. Wiggins, who saw Plaintiff on a single occasion or did not see her at all. Tr. 94, 97, 107.

Finally, the ALJ finds that Dr. Jacqmotte's description of "daily, severe, and incapacitating" symptoms cannot be reconciled with Plaintiff's academic success. Tr. 45, 1057. Once again, the ALJ unjustifiably discredits Plaintiff for her academic success based on an unsupported assumption that personal accomplishments cannot be achieved in the face of debilitating pain. The Court is not persuaded by this reasoning.

Plaintiff also argues that the ALJ improperly rejected the opinion of physical therapist Patrick Pua. Pl.'s Br. 19. On June 13, 2016, Mr. Pua conducted a two-hour functional capacity evaluation on Plaintiff and concluded that "she is unable to tolerate an 8-hour workday even at sedentary workload due to poor postural endurance." Tr. 624. Instead, Mr. Pua opined that Plaintiff can tolerate a three-to-four-hour workday, can stand for 30 minutes in a day, and walk for 30 minutes in a day in five-minute intervals. *Id.* Mr. Pua found that Plaintiff demonstrated "maximum effort" during the exam, even though Plaintiff "had to sit down halfway through her tests due to low back pain." Tr. 624, 626.

The ALJ found Mr. Pua's opinion unpersuasive, stating that his findings were inconsistent with Dr. Wiggins findings, "who considered the entire record including Mr. Pua's own findings." Tr. 44. Both parties have conceded that this statement in inaccurate. Pl.'s Br. 20; Def.'s Br. 15. The record shows that the list of medical exhibits used by Dr. Wiggins to formulate his assessment did not include Mr. Pua's assessment. Tr. 100–103; Pl.'s Br. 20. Regardless, the ALJ is correct to state that Mr. Pua's assessment contradicted the findings of Dr. Wiggins. But Dr. Wiggins opined that Plaintiff could occasionally lift 50 pounds, and frequently lift 25 pounds. Tr. 107. The ALJ concluded that "such vigorous physical activity [was] not consistent with [Plaintiff's] diagnosis," and found Dr. Wiggin's opinion unpersuasive. Tr. 43.

Finding Mr. Pua's assessment inconsistent with another medical opinion that the ALJ also found unpersuasive is circular, and not a sound reason to discredit Mr. Pua's opinion.

The ALJ also found that Mr. Pua's conclusions were inconsistent with the previous at-home physical therapy tasks assigned to Plaintiff, which, according to the ALJ, are consistent with light exertion. Tr. 44. As stated above, the mere instruction to perform a range of functional tasks – that mainly consist of stretching – does not prove that Plaintiff can perform activity at the light exertion level, notwithstanding the modifications that the ALJ made in the RFC. The record shows that Plaintiff struggles to complete these minimal exercises and cannot complete all of them in one sitting, let alone make it through an entire workday with light activity. Tr. 66, 569, 581, 594, 1057. The ALJ has not shown that the prior physical therapy records are inconsistent with Mr. Pua's findings.

Finally, the ALJ once again uses Plaintiff's academic success to contradict Mr. Pua's opinion. Tr. 44. The ALJ states that Plaintiff's attendance at school would not be possible if she spent most of her day reclining, and that her symptoms "would be expected to, at least, have some effects on her success, but she instead has a 3.96 GPA." *Id.* For the same reasons discussed above, the Court does not find the ALJ's argument convincing.

The ALJ's reasons for disregarding the opinions of Dr. Jacqmotte and Mr. Pua were not supported by substantial evidence. A proper weighing of these opinions would have supported a finding that Plaintiff is disabled. Therefore, the ALJ's errors were not harmless.

## **CONCLUSION**

The Court finds that the ALJ erred by (1) failing to provide clear and convincing reasons to disregard Plaintiff's symptom testimony; and (2) improperly rejecting the opinions of Dr. Jacqmotte, M.D., and Mr. Pua, P.T. These errors were not harmless. The Commissioner's decision is REVERSED and REMANDED for immediate payment of benefits.

IT IS SO ORDERED.

DATED this 23rd day of February, 2023.

_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge